DECISION
{¶ 1} Relator, Jacquelyn L. Yocum, commenced this original action requesting that this court issue a writ of mandamus ordering School Employees Retirement Board of Ohio ("SERB") to vacate its decision terminating a disability benefit pursuant to R.C. 3309.41, and to enter a decision reinstating the disability benefit. *Page 2 
 {¶ 2} This court referred the matter to a magistrate of this court, pursuant to Civ.R. 53 and Loc.R. 12(M) of the Tenth District Court of Appeals. The magistrate issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) Therein, the magistrate recommended that this court deny relator's request for a writ of mandamus. Relator has filed objections to the magistrate's findings of fact and conclusions of law. Therefore, this matter is now before this court for a full, independent review.
 {¶ 3} By her objections to the magistrate's findings of fact, relator does not contend that any of the magistrate's findings of fact were incorrect. Instead, relator essentially argues that the magistrate's findings of fact were incomplete. Relator outlines certain facts from the stipulated administrative record, which, according to her, the magistrate "failed to note" in his decision. Relator's argument as to the alleged significance of the omissions is only developed as it relates to her objections to the magistrate's conclusions of law. Thus, we will address those allegedly significant omissions in the context of analyzing relator's objections to the magistrate's conclusions of law only to the extent an argument is set forth as to why it was error to omit the particular facts in the magistrate's decision.
 {¶ 4} By her objections to the magistrate's conclusions of law, relator sets forth various arguments as to why, in her view, the magistrate's analysis of the issues presented was in error. One set of arguments relates to the magistrate's determination that is inaccurate to suggest that SERB's granting of the disability benefit, or the continuation of such benefit, was premised upon a finding that relator was disabled by Lyme disease. According to relator, it was not reasonable to conclude that SERB granted *Page 3 
disability retirement for anything other than Lyme disease. In support, relator asserts that her initial application for disability retirement was denied upon the recommendation of the medical advisory committee ("MAC") of the School Employees Retirement System ("SERS"), because active Lyme disease was not found by MAC in its review of the application and physician reports. In this regard, relator cites statements by MAC members as facts that the magistrate failed to note in his decision. Relator further asserts that SERB denied her second and third applications on the basis that she failed to show progression of her condition. According to relator, it was not until positive blood and urine test results were submitted that she was evaluated for Lyme disease, at SERS's request, and then granted disability retirement.
 {¶ 5} Also concerning her argument that SERB granted the disability benefit on the basis of finding that she was disabled by Lyme disease, relator challenges the magistrate's statement that it is arguable that SERB relied upon reports from other physicians other than Dr. Rodney K. Kusumi. Correspondingly, relator argues that the magistrate erred in referring to the report of Dr. Howard R. Smith as an example of a report finding relator disabled as a result of an examination that pre-dated Dr. Kusumi's February 6, 2001 report. In addition, relator asserts that the magistrate failed to note in his findings of fact that Dr. Kusumi certified that relator became disabled beginning August 1998.
 {¶ 6} Notwithstanding relator's arguments, in the final analysis, the magistrate's statement that it is arguable that SERB additionally relied upon reports from other physicians that pre-date Dr. Kusumi's initial examination, as well as his reference to the report of Dr. Smith as an example of one of those reports, are inconsequential. Relator's *Page 4 
challenge to this statement of the magistrate is premised on the proposition that, in granting the disability benefit, SERB only relied upon Dr. Kusumi's reports. Although SERB clearly relied upon the reports and certifications of Dr. Kusumi, the record, as outlined by the magistrate, demonstrates that Dr. Kusumi was uncertain that Lyme disease was causing the disability. Therefore, relator's argument that the disability benefit was granted based solely on Lyme disease is unpersuasive.
 {¶ 7} Relator's second set of arguments relates to the magistrate's analysis regarding SERB's reliance upon Dr. Claire V. Wolfe's report and certification in its decision to terminate the disability benefit. Relator argues that the evidence demonstrates that she has active Lyme disease, and that there is no evidence that she is not disabled due to Lyme disease. According to relator, Dr. Joseph T. Joseph, who "knows Lyme disease," provided objective evidence indicating that relator has active Lyme disease. Relator asserts that she qualified for a study on Lyme disease conducted by Columbia University, and that 2005 blood and urine tests confirmed the existence of active current Lyme disease. She argues that this information has not been refuted. Correspondingly, relator contends that, contrary to the magistrate's determination, Dr. Wolfe did not evaluate for Lyme disease because the SERS form requesting the exam asked Dr. Wolfe to examine for fibromyalgia and chronic fatigue, and because the notation, "Lyme Disease, by history," in Dr. Wolfe's report does not indicate that she evaluated for disability due to Lyme disease.
 {¶ 8} In addition, relator challenges Dr. Wolfe's competency to evaluate the question of relator's continuing disability. As to this particular issue, relator specifically argues that the magistrate erred in finding that no physician has indicated that Dr. Wolfe *Page 5 
is unqualified to examine for active symptoms of Lyme disease. Apparently, relator challenges the magistrate's observation that "no physician of record has stated that Dr. Wolfe is unqualified to examine for active symptoms of Lyme disease or that she is incompetent to evaluate for Lyme disease." (Magistrate's Decision, at ¶ 81.) In support of her argument, relator cites Dr. Daniel M. Dorfman's report. In his January 7, 1998 report, Dr. Dorfman stated in part: "I do not feel qualified to assess the issue of Lyme disease and feel that Ms. Yocum may benefit from psychological assessment to address whether true depression is present and contributing to her current symptom complex." Dr. Dorfman also recommended that relator see a specialist in Lyme disease. Dr. Wolfe, like Dr. Dorfman, is a physical medicine specialist.
 {¶ 9} By referring to Dr. Dorfman's report, relator seems to imply that Dr. Dorfman's statement that he did not feel "qualified to address the issue of Lyme disease" necessarily correlates to a finding that Dr. Wolfe was unqualified to examine for Lyme disease symptoms or was incompetent to evaluate for Lyme disease. We find that the fact that Dr. Dorfman stated that he did not feel "qualified to address the issue of Lyme disease" did not preclude SERB from relying upon Dr. Wolfe's report, even though both physicians are physical medicine specialists. In other words, we cannot conclude that Dr. Dorfman's statements regarding whether he felt qualified to address the issue of Lyme disease and his opinion regarding who should evaluate relator as to the Lyme disease issue, constituted a statement that Dr. Wolfe is incompetent to examine and evaluate for Lyme disease.
 {¶ 10} Upon review, and notwithstanding relator's objections, we find that the magistrate adequately addressed the issues relating to whether Dr. Wolfe examined her *Page 6 
for Lyme disease and whether Dr. Wolfe's report and certification provided a valid basis for the termination of the disability benefit. Therefore, relator's arguments as to those issues are unpersuasive for the reasons set forth in the magistrate's decision.
 {¶ 11} Following our independent review of this matter, we conclude that the magistrate discerned the pertinent facts and applied the relevant law to those facts. Therefore, we overrule relator's objections to the magistrate's decision and adopt the magistrate's decision as our own, including the magistrate's findings of fact and conclusions of law. Accordingly, we deny relator's request for a writ of mandamus.
Objections overruled; writ denied.
 SADLER, P.J., and McGRATH, J., concur. *Page 7 
 APPENDIX A MAGISTRATE'S DECISION {¶ 12} In this original action, relator, Jacquelyn L. Yocum, requests a writ of mandamus ordering respondent School Employees Retirement Board of Ohio ("SERB") to vacate its decision terminating a disability benefit pursuant to R.C. 3309.41, and to enter a decision reinstating the disability benefit. *Page 8 
 Findings of Fact:
 {¶ 13} 1. On November 25, 1997, relator filed a disability retirement application with the School Employees Retirement System ("SERS"). Relator had been employed by the Champion Local Board of Education as a secretary to an assistant high school principal.
 {¶ 14} 2. In support of the 1997 application, attending physician Leonard H. Kanterman, M.D., certified on a SERS form that, as of November 1997, relator is unable to perform her duties as a school employee. On the form, Dr. Kanterman listed fibromyalgia, Lyme disease, and chronic fatigue syndrome as the primary conditions for which medical disability exists.
 {¶ 15} 3. The 1997 disability application prompted SERS to schedule relator to be examined by three physicians. On January 7, 1998, relator was examined by Daniel M. Dorfman, M.D., who specializes in physical medicine and rehabilitation. In his report, Dr. Dorfman states that he was asked by SERS to "assess eligibility for disability retirement on the basis of `fibromyalgia'." Dr. Dorfman opined:
 DIAGNOSES:
 1. Fibromyalgia.
 2. Possible Lyme disease.
 3. Possible depression.
 IMPRESSION: Ms. Yocum is a 51-year-old white female who has clear evidence of fibromyalgia on clinical examination. She has equivocal history of Lyme disease but more recent diagnostic testing has been negative for this entity. There appears to be a component of depression associated with her pain complaints and perceived restricted functioning and this two [sic] is likely contributing to her ongoing pain, fatigue and restricted physical performance. Although she clearly does have evidence of fibromyalgia, I find no reason on clinical examination to suggest that she could not perform *Page 9 
the physical demands of her occupational position and in this regard cannot justify disability retirement on the basis of fibromyalgia. I do not feel qualified to assess the issue of Lyme disease and feel that Ms. Yocum may benefit from psychological assessment to address whether true depression is present and contributing to her current symptom complex.
Also in his January 7, 1998 report, Dr. Dorfman recommended:
 Ms. Yocum would need a specialist in Lyme disease to address whether she in fact has this condition and whether there is any disability associated with the disease if present as I do not feel qualified to address this issue.
 {¶ 16} 4. On January 14, 1998, relator was examined, at the request of SERS, by Howard R. Smith, M.D. In his report, Dr. Smith states:
 It would [be] reasonable to conclude that this woman has fibromyalgia/chronic fatigue syndrome that may be secondary to lyme disease. Her condition at this point makes it difficult for her to concentrate, stand or walk throughout the work day or perform activities which require a normal amount of energy level. It would be my recommendation, based upon the above that it would be difficult for her to continue her work as a high school secretary because of these medical problems.
 {¶ 17} 5. On a SERS form, Dr. Smith certified that as of November 1997, relator is unable to perform her duties as a school employee.
 {¶ 18} 6. On January 24, 1998, relator was examined, at the request of SERS, by psychiatrist Jeffrey C. Hutzler, M.D. Dr. Hutzler wrote that relator "is not in-capacitated in her ability to work from a purely psychiatric standpoint."
 {¶ 19} 7. On September 4, 1998, Edwin H. Season, M.D., the chairman of the medical advisory committee ("MAC") recommended to SERB that relator's application for disability retirement be denied. Thereafter, relator was informed that SERB had denied her application on September 11, 1998. *Page 10 
 {¶ 20} 8. On January 28, 1999, relator filed a second disability retirement application. In support of her second application, attending physician Dr. Kanterman certified disability based upon fibromyalgia and chronic fatigue syndrome. Unlike his certification of the first application, Dr. Kanterman did not list Lyme disease as a medical condition supporting the application. Thereafter, SERS informed relator that, upon her reapplication, it would be necessary to show that her fibromyalgia and chronic fatigue syndrome had progressed.
 {¶ 21} 9. On July 16, 1999, indicating relator's failure to show progression of her medical conditions, Dr. Season, on behalf of MAC, recommended that relator's reapplication be denied. In August 1999, relator was informed that SERB had rejected her reapplication for disability retirement.
 {¶ 22} 10. On December 14, 1999, relator filed her third application for disability retirement. In support of the application, rheumatologist Leonard Sigal, M.D., of New Jersey, certified on an attending physician's report that relator is unable to perform her duties as a school employee. Dr. Sigal wrote: "Fibromyalgia, perhaps as a post-Lyme disease syndrome," as the medical condition causing disability.
 {¶ 23} 11. In further support of the third application, Dr. Kanterman also certified that relator is unable to perform her duties as a school employee. Dr. Kanterman listed "fibromyalgia" as the primary medical condition causing disability and "lyme's disease" as the underlying condition.
 {¶ 24} 12. In further support of the third application, Tauseef G. Syed, M.D., also certified that relator is unable to perform her duties as a school employee. Dr. Syed listed *Page 11 
"Lyme Disease, chronic fatigue syndrome, fibromyalgia," as the conditions causing disability.
 {¶ 25} 13. The record contains a report from Dr. Sigal dated November 18, 1999, stating:
 I believe that Ms. Yocum has fibromyalgia possibly as a post Lyme disease syndrome. There is no reason to believe that she has ongoing Lyme disease at this time. Rather, at this time she has poorly treated fibromyalgia. Although she does fall asleep she awakens unrefreshed from her nights' sleep suggesting that she still has a sleep disorder despite her current Elavil 10mg a[t] bedtime. We have had remarkable success with Norflex in such patients with or without increasing the tricyclic antidepressant dose at bedtime. As well, we have begun treating some of our more refractory patients with an SSRI in the morning and Neurontin 300mg three times a day. This is based on prior studies suggesting that there may be a depletion in brain gamma amino butyric acid levels as well as depletion of serotonin. Our experience has been that in the absence of restitution of normal sleep there is no return to normal function. Thus, our experience would be that with further therapy Ms. Yocum stands a very good chance of being returned to her normal function.
 {¶ 26} 14. By letter dated April 21, 2000, relator was informed that SERB had denied her third application on April 19, 2000.
 {¶ 27} 15. On August 8, 2000, relator filed her fourth application for disability retirement. In support of this application, Joseph T. Joseph, M.D., of Hermitage, Pennsylvania, certified that relator is unable to perform her duties as a school employee.
 {¶ 28} 16. Relator's fourth application prompted SERS to schedule relator for an examination by Rodney K. Kusumi, M.D., on February 6, 2001. Dr. Kusumi apparently specializes in the treatment of infectious diseases. He reported:
 At this time, it appears that she may have had Lyme disease. It seems that she has had adequate recurrent therapy for this but continues to be symptomatic, and I think *Page 12 
there is a question as to whether this might be fibromyalgia or possibly related to Lyme disease. At this time, I would find it unusual for this to be directly related to Lyme disease at least from an active viewpoint. This may be some sort of immunologic reaction.
 Taken in context, and I have focused back on the situation in 1992, it appears that she in all likelihood probably did have Lyme disease. Therefore, I guess we should probably consider her to have disability on an ongoing basis because of that problem. Once again, it may be because of active disease or more likely because of some sort of reaction to the initial Lyme disease infection.
 {¶ 29} 17. In a letter to SERB dated February 28, 2001, Dr. Season wrote:
 The examiners for SERS certified that the member was disabled. The Medical Advisory Committee reviewed all of the information that was submitted and recommends that disability retirement be approved on the basis Lyme's disease with reexamination in one year.
 {¶ 30} 18. Thereafter, SERB granted relator's fourth application for disability retirement. The effective date of the retirement was set at September 1, 1998.
 {¶ 31} 19. At the request of SERS, relator was reexamined by Dr. Kusumi on August 29, 2002. In his report dated September 3, 2002, Dr. Kusumi wrote:
 This is a very unusual situation. As you know, there is controversy about chronic Lyme disease. She does have some lab reports that would indicate she has a borderline positive IgM Western blot antibody test from June of 2001. The significance of this is really not clear in the context of clinical findings. There are individuals who are experts in this field, who feel that chronic Lyme disease manifestations are more of an immunologic process rather than an issue of active spirochete infection in multiplication. It appears to me that she has had several courses of antibiotics that should adequately eradicate any infection that she has, absent any new exposure, which she apparently has not had.
 I feel uncomfortable diagnosing her with chronic disease based on an antibody test result, especially in light of her heavy antibiotic treatment history. To be quite honest, I feel *Page 13 
that she would be best served by being evaluated at a center or clinic where this problem has been seen before, and she could then be evaluated in a very objective manner. I get the sense that she is being seen by a physician who is of the opinion that she has active ongoing disease, and the physician whom she saw in New Jersey was of the opposite opinion. I would think the an [sic] evaluation by one of the physicians who, perhaps, is in the Connecticut Area would be perhaps the most definitive and decisive way to resolve this issue. I think they see a lot of patients who have had Lyme disease, those who don't have Lyme disease but think they do, and have dealt with the issue of possible chronic Lyme infection.
 I would suggest that we would consider her disabled for another twelve months, during which time she would seek an evaluation by a Lyme disease expert in Connecticut.
 {¶ 32} 20. By letter dated January 29, 2003, Dr. Season, on behalf of MAC, recommended that disability retirement be continued with reexamination in one year.
 {¶ 33} 21. By letter dated March 21, 2003, relator was informed that the "continuance" of her disability benefits was approved by SERB and that she would be reexamined in approximately one year.
 {¶ 34} 22. At the request of SERS, relator was reexamined by Dr. Kusumi on May 13, 2004. Dr. Kusumi wrote:
 Ms. Yocum is a 57-year-old woman who was seen today in the office, accompanied by her husband. She has a history of possible Lyme disease that was acquired in 1992, and since that time, she has had an ongoing constellation of symptoms including what is felt to be fibromyalgia with arthralgias, myalgias, fatigue, vague mental status changes, and has had ongoing recurrent treatment episodes with antibiotics. She has been disabled, I think, for the last approximate four years.
 * * *
 Once again, I have conflicting emotions about whether she is disabled from an infectious disease viewpoint. She may *Page 14 
have had Lyme disease. What she has now is not clear. As I mentioned in my previous correspondence, there is currently some question in the literature as to whether patients similar to Ms. Yocum have ongoing active infection, which seems unlikely in the face of the multitude of antibiotic treatments, or whether she may have some sort of post-infectious inflammatory process. It may be that she has neither and simply suffers from either fibromyalgia or depression.
 My suggestion at this point is that she return to see Dr. Segal who is an expert in this field, who practices in New Jersey, and I do note that she previously saw him about five or six years ago. She might also go to Connecticut, where of course this illness is much more common, and the various manifestations are more familiar to the physicians who practice there.
 I guess I would at this point proceed to give her a vote of disability for the next several months with the understanding that arrangements be made for her to see someone in New Jersey or Connecticut for another opinion.
 {¶ 35} 23. On a SERS form dated May 13, 2004, Dr. Kusumi certified that "[t]he retiree continues to be inacapable of resuming the performance of the last assigned primary duty for which they were formerly responsible as a school employee."
 {¶ 36} 24. At the request of SERS, relator was examined by Claire V. Wolfe, M.D., on November 1, 2004. Dr. Wolfe is a diplomate, American Board of Physical Medicine and Rehabilitation and a fellow American Academy of Physical Medicine and Rehabilitation. Her letterhead indicates that she practices with a group which identifies itself as the Ohio Orthopedic Center of Excellence. Dr. Wolfe's name is listed on the letterhead among a subgroup called the Ohio Spine Institute. In her three-page narrative report, Dr. Wolfe wrote:
 History: Jacquelyn Yocum is a 58-year old woman who worked as a Secretary to the Principal of the Champion School District in Trumbull County for 13 years. She last worked about six years ago (she believes 1998), and she *Page 15 
has been on SERS disability since that time because of Lyme Disease.
 Mrs. Yocum states she was diagnosed with Lyme Disease in 1992 and had 28 days of IV Rocephin therapy. She did well initially but, within six months of the IVs, her symptoms recurred, and she had another round of Rocephin for 14 more days. Once again, in about six months, she again had recurrent symptoms of joint pain, muscle pain and sore throats, plus "extreme fatigue." She continued to work for the six years after her diagnosis, often going hom[e] and having IV antibiotics and then going to school again. Eventually, it just [got] to be too much, and she had no stamina or ability to continue working. Over 12 years, she had the IV antibiotics five times. Two years ago, her physician who treats her for Lyme Disease, Dr. Joseph, I believe, began giving her Bicillin, initially weekly and then two every two weeks. This regimen has been maintaining her better and has increased her function and decreased her fatigue and thus her overall quality of life. She had also been on Vioxx which, for her, had been a "wonder drug." Since it was withdrawn from the market, she has been on Celebrex 400 mg daily but does not find it nearly as helpful. She has been on Elavil 25 mg HS to help her with her sleep, and she has been on that for six or seven years and finds it very helpful. She was quite aware of the use of Elavil to help with sleep disturbances and also to help patients tolerate pain. Her only other medication is Estrace 1 mg daily.
 Mrs. Yocum describes her pain as migratory. It moves from muscles to joints and back again. At its worst, she states it would have been a 10/10, bringing tears to her eyes, "even though I always thought I had a high pain threshold." At the very best, after Bicillin, she would be perhaps a 5/10. On average, she would consider her pain a 7/10. When I asked her about fibromyalgia, Mrs. Yocum stated she had seen two rheumatologists previously, who felt she did have fibro-myalgia, but her Lyme Disease physician has said she had Lyme Disease and that her symptoms are due to that and not to fibromyalgia. She has, however, read up about fibro-myalgia and feels that a lot of her symptoms are consistent with that diagnosis.
 Review of systems: Mrs. Yocum's review of systems is positive for weight gain, periodic rashes, chest pain, leg pain with walking, constipation or diarrhea, both heat and cold *Page 16 
intolerance, a feeling of general weakness, neck and back pain, plus depression. She very recently has had some pain in her left foot between her 2nd and 3rd toes that has a little bit interfered with her walking that she tries to do every day. In the past, when she has had pain in her toes, she underwent fluoroscopic injection of her small toe joints, which she stated helped dramatically. She has overall had about 25 shots of Cortisone in various joints during various times.
 For exercise she tries to walk about five miles a week, usually ¾ mile a day, once or twice around her block, and that ¾ mile takes her about 15-20 minutes. She does some stretching on her own.
 * * *
 Physical examination: Mrs. Yocum, when she first got up walked quite stiffly and did very poor pushoff on her left foot. That improved as she walked back and forth across the examining room, but she did not feel she could stand comfortably on her toes of her left foot because of pain. She was able to stand on her heels with my assistance for balance, although she stated that standing on her heels caused her right knee to hurt.
 Her skin examination today revealed no evidence of any rashes on her face, arms or legs. I did not check her trunk. Her speech was clear, and she had no evidence of facial asymmetry. Her upper extremity neurologic exam revealed 2+ and symmetric reflexes at the biceps and triceps, and she was uncomfortable with me checking them because of discomfort. None of her joints today had any warmth, redness, evidence of synovitis or deformities. She was nevertheless quite tender in lots of different places. When I asked her to do forced grip, she stated that it hurt her right long finger, both on the volar and extensor aspects. There was, however, full range of motion of all digits of both hands. When I was grasping her wrists to do manual muscle testing, she complained of severe pain on the left over the radial styloid, but testing her thumb flexors and extensors did not elicit the same type of discomfort. I did not think there was full effort on checking the ulnar hand intrinsics. The wrist extensors otherwise I though[t] had normal strength. Checking external rotators caused her severe pain in her shoulders. Testing internal rotators was normal. She has *Page 17 
normal strength in her triceps bilaterally. She was exquisitely tender to palpation over that left wrist on both the radial and ulnar aspect. She was exquisitely tender over the lateral epicondyles of both elbows, left more so than right. She was profoundly tender to even light touch in her anterior chest wall bilaterally. The same was true in her upper traps and levators, which were rock hard. She was also exquisitely tender to palpation in her mid dorsal paraspinals, lumbar paraspinals and both buttocks.
 She did not have too much discomfort today over her greater trochanters. She had a tender point in her right medial knee above the joint space. She had no tenderness around her ankles. She complained of severe pain with checking for metatarsalgia of the left foot that was not present on the right, but she also complained of intense pain with even light palpation between her 2nd and 3rd
toes. Again, I reiterate that there was no synovitis present in any joints, no warmth and no effusions. Her ranges of motion of all major joints in both upper and lower extremities was normal. Her reflexes at the knees, adductors, medial hamstrings and ankles were brisk and symmetrical bilaterally. In the lower extremities, although she could stand on her heels and toes, she did not give any effort on toe extension with a lot of ratchety motion and with resistance. Her straight leg raising was unremarkable. Her knee ranges of motion were full with just some mild patellofemoral crepitus on the left. Hip ranges of motion were full.
 Impression:
 1. Fibromyalgia syndrome.
 2. Lyme Disease, by history.
 Discussion: I suppose her fibromyalgia could be secondary to her Lyme Disease, or most of her symptoms could be due to her fibromyalgia. Lyme Disease, as I understand it, usually responds to antibiotic treatment. She certainly had that, but even if her Lyme Disease was chronic, she has none of the neurologic stigmata of Lyme Disease, and she has no objective evidence of involvement of her joints with any type of inflammatory arthropathy.
 I find nothing objective that would preclude Mrs. Yocum from doing the duties of a School Secretary. *Page 18 
 {¶ 37} 25. On a SERS form dated November 1, 2004, Dr. Wolfe certified:
 The retiree is no longer incapable of resuming the performance of the last assigned primary duty for which they were formerly responsible as a school employee.
 {¶ 38} 26. On December 10, 2004, on behalf of MAC, Dr. Season advised the retirement committee that MAC recommends that disability retirement be terminated.
 {¶ 39} 27. By letter dated December 17, 2004, relator was informed that SERB had decided to terminate her disability benefit. The letter also informed relator of her right to appeal SERB's decision.
 {¶ 40} 28. Relator timely filed an administrative appeal of SERB's December 17, 2004 decision. Relator also requested a personal appearance before SERB's retire-ment committee with her legal counsel.
 {¶ 41} 29. In support of her appeal, relator submitted a report dated February 10, 2005, from Dr. Joseph, stating:
 As you well know, the above captioned individual has been diagnosed with Lyme and treated by us in the past.
 I am enclosing copies of her most current testing for Lyme Disease. The IGG and IGM West Blot were both positive. She more than likely will test positive with the IGG for a lifetime. The IGM Western Blot is still troublesome because the [sic] continues to have a persistence of IGM antibodies which indicates that she has active current disease.
 At this present time, I still feel she has active disease. We have her on antibiotics at the present time. I just saw her today — February 10, 2005. Of course, her disability continues. Most consistent with Lyme Disease would be the severe fatigue that she experiences. The other thing that is troublesome is that her sedimentation rate is 45 and it was down into the 20s when she was on treatment. As soon as she came off treatment with antibiotics her sed rate went back to 45. I see this frequently with patients with Lyme Disease. Lyme causes elevation in the sed rate which is a *Page 19 
test of generalized inflammation. At this juncture in time, I believe she still has active persistent disease and that will entail antibiotic treatment. She still manifests the symptoms of severe fatigue which is the most significant neurologic symptom at this time. She does have the joint pain consistent with late stage Lyme Disease.
 {¶ 42} 30. On February 21, 2005, relator's counsel wrote to SERS:
 * * * As Dr. Joseph's report indicates and the objective tests confirm, Ms. Yocum continues to suffer from active, current Lyme disease.
 As the System knows, Ms. Yocum's history is long and not without confrontation. Dr. Kusumi, who has evaluated Ms. Yocum now three separate times, the last time on May 13, 2004, certified that she "continues to be incapable to resume the performance of the last assigned primary duty.["] In his May 13, 2004 written report, Dr. Kusumi questioned, however, if Ms. Yocum has ongoing active Lyme disease infection. He also questioned, therefore, the nature of her current "ongoing constellation of symptoms." Are the symptoms due to active Lyme disease? He recommended evaluation by an "expert" in this field.
 Ignoring Dr. Kusumi's certification, and his recommendation for an evaluation by a Lyme disease expert, the Retirement System chose to have Ms. Yocum evaluated for possible fibromyalgia and/or depression. Dr. Wolfe, in her evaluation report stated that she could find "none of the neurologic stigmata of Lyme disease." Dr. Wolfe did confirm however that Ms. Yocum continues to suffer pain on an average level of seven out of 10 and sever fatigue. (As Dr. Joseph indicated in his communitcation, the most significant neurologic symptoms evidencing Ms. Yocum's continued symp-tomology from Lyme disease is in her severe fatigue and the joint pain.) (Dr. Joseph's report and test results confirm that Ms. Yocum continues to suffer from active Lyme disease infection. Dr. Joseph is an expert in the field.)
 Based upon Dr. Joseph's report and test results, and based upon Dr. Kusumi's evaluation and certification, Ms. Yocum's disabling symptoms are due to her active, current Lyme disease. Her disability arises from her Lyme disease. *Page 20 
 It is unfortunate that the Retirement System refuses to follow the advise of its own independent evaluators and have Ms. Yocum evaluated by a physician who is an expert with Lyme disease. * * *
 The continuation of her Lyme disease active infestation has resulted in her being sought out to be a participant in studies to be performed at Columbia University under the direction of Dr. Brian Fallon, Associate Professor of Clinical Psychiatry and Director of Lyme disease research. * * *
 * * * She continues to suffer from, and with, active Lyme disease, and associated disabling symptoms. We request that the termination of her disability retirement be reversed and her benefits continued. * * *
(Emphasis sic.)
 {¶ 43} 31. On April 19, 2005, Dr. Kanterman wrote:
 She has been treated with a variety of antiinflammatory agents as well as antidepressants for fibromyalgia with little relief. She is currently receiving weekly penicillin injections for suppression of her Lyme disease.
 I last saw Mrs. Yocum today, April 19, 2005. She is about in the same condition now as she was in the year 2000. She needs to rest at least 4 to 5 times a day because of the extreme fatigue. She has a lot of joint pain, aching, and stiffness despite taking large doses of antiinflammatory medications. Her current medication regimen includes Elavil 25 mg at bedtime, Motrin 800 mg 3 times a day, and Estrace as well as the penicillin injections. Her most recent laboratory data showed that her Lyme disease is still active with an elevated sedimentation rate of 49 and positive western blot for Lyme tests.
 On her most recent physical examination she had marked tenderness and some joint swelling over the left wrist and left ankle as well as stiffness in her neck with decreased range of motion and tenderness and swelling over the left second and third digits. *Page 21 
 term consequence of her exposure to Lyme disease. Her condition has remained stable since 2000, and in my opinion she remains completely and permanently disabled and unable to perform any gainful employment due to the multitude of symptom limitations that she has at this time.
 {¶ 44} 32. On April 22, 2005, relator personally appeared before the retirement committee with her counsel.
 {¶ 45} 33. Following relator's personal appearance before the retirement board, MAC met in special session on June 20, 2005, to discuss relator's disability status. Following the special session, MAC members Timothy J. Fallon, M.D., Barry Friedman, M.D., and Marjorie C. Gallagher, M.D., each wrote to Dr. Season.
 {¶ 46} 34. On June 21, 2005, Dr. Fallon wrote:
 * * * She is 58 years of age and working as a school secretary and indicates a basis for disability as being Lyme disease and residuals thereof.
 Information presented indicated that she had undergone antibiotic treatment for this disease process. She was felt to have an element of fibromyalgia and chronic fatigue as well.
 She has had recent elevated sed rate and positive Western Blot test in January of this year, 2005.
 The various citations and information from the web were reviewed. In addition, we had the benefit of reports from Dr. Kusumi of May of 2004 as well as the report from Dr. Claire Wolfe, a physiatrist, of November 1, 2004. Dr. Wolfe evaluated her from a musculoskeletal status and evaluated her complaints of arthralgias and myalgias and determined that while she did have fibromyalgia that this was not to be considered a disabling condition for her work as a secretary.
 My medical opinion following review of the information in regards to the appeal is that the information presented does not substantiate disability. She is symptomatic apparently from her fibromyalgia, but this would not be considered disabling for continuing in her work activity as a school *Page 22 
secretary. I again reviewed the job description which had been provided in this regard.
 {¶ 47} 35. On June 21, 2005, Dr. Friedman wrote:
 On June 20, 2005 the Medical Advisory Committee of SERS met in special conference to review the disability benefit that Ms. Yocum has been receiving on the basis of Lyme disease. It was noted that recent evaluations have raised the question of chronic fatigue/fibromyalgia as a source of Ms. Yocum's chronic symptoms despite multiple courses of antibiotic therapy.
 After review and discussion it was the unanimous opinion of the Committee that Ms. Yocum is not disabled for the performance of her previous duties. It was the unanimous recommendation of the Committee that Ms. Yocum's disability benefit be terminated.
 {¶ 48} 36. On June 21, 2005, Dr. Gallagher wrote:
 Following extensive discussion, the members of the Medical Advisory Committee in unanimous agreement determined that Ms. Yocum is no longer disabled, is able to work, and should not be continued on disability retirement.
 {¶ 49} 37. On June 22, 2005, Dr. Season wrote:
 Information submitted on appeal was reviewed. Based upon review of the entire file, including the submissions on appeal and personal appearance testimony, the Medical Advisory Committee in special conference see no basis to change the original decision to terminate disability retirement.
 {¶ 50} 38. By letter dated June 24, 2005, SERB informed relator that, on June 23, 2005, it had decided to uphold its original decision to terminate disability retirement benefits. The letter further informed relator that all administrative appeal rights had been exhausted.
 {¶ 51} 39. On July 29, 2005, relator, Jacquelyn L. Yocum, filed this mandamus action. *Page 23 
 Conclusions of Law:
 {¶ 52} On February 28, 2001, SERB granted relator's fourth disability application. SERB granted the disability benefit effective September 1, 1998. Relator's fourth application prompted SERS to have relator examined by Dr. Kusumi on February 6, 2001, and Dr. Kusumi certified disability.
 {¶ 53} Clearly, SERB relied upon Dr. Kusumi's reports and certifications to support its award of disability benefits. However, because SERB also awarded disability benefits for a back period some 30 months prior to Dr. Kusumi's initial examination, it is at least arguable that SERB additionally relied upon reports from other physicians that pre-date Dr. Kusumi's initial examination. For example, in January 1998, Dr. Smith certified that relator is unable to perform her duties as a school employee. Dr. Smith's certification occurred with respect to relator's initial application. Dr. Smith was an examining physician appointed by SERS who concluded that relator has "fibromyalgia/chronic fatigue syndrome that may be secondary to Lyme disease."
 {¶ 54} There is no doubt that SERB relied primarily, if not exclusively, upon Dr. Wolfe's November 1, 2004 report and certification to terminate the disability benefit.
 {¶ 55} The main issue is whether Dr. Wolfe was competent to evaluate the question of continuing disability in light of the medical basis for SERB's initial decision to grant a disability benefit. Finding that Dr. Wolfe was competent to evaluate and to certify that relator is no longer incapable of resuming the performance of her duties as a school employee, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below. *Page 24 
 {¶ 56} R.C. 3309.39(A) provides that SERS shall provide disability coverage to its members.
 {¶ 57} R.C. 3309.39(C) provides:
 Medical examination of a member who has applied for a disability benefit shall be conducted by a competent disinterested physician or physicians selected by the retirement board to determine whether the member is mentally or physically incapacitated for the performance of the member's last assigned primary duty as an employee by a disabling condition either permanent or presumed to be permanent for twelve continuous months following the filing of an application. * * *
 {¶ 58} R.C. 3309.41(B) provides:
 The school employees retirement board shall require a disability benefit recipient to undergo an annual medical examination, except that the board may waive the medical examination if the board's physician or physicians certify that the recipient's disability is ongoing. * * *
 {¶ 59} R.C. 3309.41(C) provides in part:
 On completion of the examination by an examining physician or physicians selected by the board, the physician or physicians shall report and certify to the board whether the disability benefit recipient is no longer physically and mentally incapable of resuming the service from which the recipient was found disabled. If the board concurs in the report that the disability benefit recipient is no longer incapable, the payment of the disability benefit shall be terminated not later than three months after the date of the board's concurrence[.] * * *
 {¶ 60} Supplementing the statutes, Ohio Adm. Code 3309-1-40(A)(1) states:
 "Disability" means disabling condition, either permanent or presumed to be permanent for twelve continuous months following the filing of an application, which has occurred or increased since the applicant last became a member and which renders the member mentally or physically incapacitated for the performance of the member's last assigned primary duty as an employee. *Page 25 
 {¶ 61} Ohio Adm. Code 3309-1-40(A)(4) states: "Board physician" means the chairman of the medical advisory committee."
 {¶ 62} Ohio Adm. Code 3309-1-40(A)(5) states:
 "Examining physician(s)" means the disinterested physician(s) assigned by the system or the chairman of the medical advisory committee to conduct medical examinations of a disability applicant or recipient to determine eligibility to obtain or continue to receive disability benefits.
 {¶ 63} Ohio Adm. Code 3309-1-40(B) states:
 The school employees retirement board shall appoint a minimum of three members to the medical advisory committee who shall be physicians who demonstrate a wide range of competent medical experience, and a chairman for the medical advisory committee who shall act as medical advisor to the board. The chairman shall have authority and responsibility to assign competent and disinterested physicians to conduct medical examinations of disability applicants and recipients for the purpose of determining the member's eligibility to obtain and continue to receive disability benefits. * * *
 {¶ 64} Ohio Adm. Code 3309-1-40(M) states:
 (M) The examining physician(s) shall make a report of any required reexamination on a form provided by the board. The board physician shall review the report and certify to the board whether the recipient is no longer incapable of resuming the service from which the recipient was disabled.
 * * *
 (2) If the board physician certifies that the recipient is no longer incapable of resuming the service from which the recipient was disabled and the board concurs, the board shall:
 (a) Terminate the disability benefits not later than three months after the board's concurrence, or upon notice of employment of the recipient as an employee. *Page 26 
 {¶ 65} Thus, by statute and by rule, the chairman of MAC (Dr. Season) was required to assign competent and disinterested physicians to conduct the medical examinations pertinent to relator's disability award. In short, by statute and by rule, Dr. Wolfe must be competent to conduct the medical examination that she was assigned to perform.
 {¶ 66} Neither the statutes nor the rules pertaining to SERS define the word "competent" as it pertains to examining physicians selected by the MAC chairman. However, by analogy, there is case law defining the ordinary meaning of the word "competent" as it appears in R.C.145.35(E), a statute relating to the Ohio Public Employees Retirement System ("PERS"). That statute, much like R.C. 3309.39(C) at issue here, also provides that the medical examinations of a PERS member who has applied for a disability benefit shall be conducted by "competent disinterested physician or physicians."
 {¶ 67} In State ex rel. Pontillo v. Pub. Emp. Retirement Sys.Bd., 98 Ohio St.3d 500, 2003-Ohio-2120, at ¶ 41, the court construed "competent disinterested physician" as it appears in R.C. 145.35(E):
 * * * In construing a statute, we must review the language, "reading undefined words and phrases in context and construing them in accordance with the rules of grammar and common usage." State ex rel. Portage Lakes Edn. Assn., OEA/NEA v. State Emp. Relations Bd., 95 Ohio St.3d 533, 2002-Ohio-2839, 769 N.E.2d 853, ¶ 36. The ordinary meaning of "competent" is "possessed of or characterized by marked or sufficient aptitude, skill, strength, or knowledge," and "disinterested" means "[f]ree from bias, prejudice, or partiality." Webster's Third New International Dictionary (1986) 463; Black's Law Dictionary (7th Ed. 1999) 481. *Page 27 
 {¶ 68} According to relator, respondent's examining physician, Dr. Kusumi, certified in 2001 that relator "was disabled and unable to perform her previous duties due to lyme disease," and on that basis approved relator's disability retirement application. (Relator's brief at 11; see, also, relator's reply brief at 2-3.) According to relator, although Dr. Kusumi indicated that he lacked sufficient expertise to continue to evaluate for Lyme disease, he nevertheless certified continued eligibility for a disability benefit due to Lyme disease in September 2002 and May 2004 and respondent continued the award based on Dr. Kusumi's certifications. (Relator's brief at 13.)
 {¶ 69} According to relator, Dr. Wolfe examined relator for fibromyalgia and chronic fatigue, but not for Lyme disease. (Relator's brief at 12-13.) Relator claims that Dr. Wolfe is "not qualified" to evaluate for Lyme disease. (Relator's brief at 16.) Relator further argues:
 * * * Ms. Yocum does not dispute that Dr. Wolfe is competent to evaluate for fibromyalgia, as her area of expertise is as a physical medicine specialist. What Ms. Yocum contends is that it is an abuse of discretion and unconscionable for SERB to contend that Dr. Wolfe has the expertise to evaluate for disabling symptoms due to lyme disease. * * *
(Relator's reply brief at 6.)
 {¶ 70} Having claimed that respondent granted a disability benefit based solely on Lyme disease and that Dr. Wolfe is not competent or otherwise qualified to evaluate for Lyme disease, relator concludes that Dr. Wolfe's report provides no basis for termination of the disability benefits. Relator argues:
 * * * What is, however, unconscionable and constitutes an abuse of discretion, is when SERB re-evaluates for conditions which were not the basis of the disability retirement, and then, in response to a report that those *Page 28 
conditions are not disabling, terminates disability retirement benefits. * * *
(Relator's reply brief at 5.)
 {¶ 71} Relator's argument misconstrues the facts and law.
 {¶ 72} To begin, in his first report to SERB dated February 6, 2001, Dr. Kusumi expressed uncertainty as to the cause of relator's medical condition which he found to be disabling:
 At this time, it appears that she may have had Lyme disease. It seems that she has had adequate recurrent therapy for this but continues to be symptomatic, and I think there is a question as to whether this might be fibromyalgia or possibly related to Lyme disease. At this time, I would find it unusual for this to be directly related to Lyme disease at least from an active viewpoint. This may be some sort of immunologic reaction.
 Taken in context, and I have focused back on the situation in 1992, it appears that she in all likelihood probably did have Lyme disease. Therefore, I guess we should probably consider her to have disability on an ongoing basis because of that problem. Once again, it may be because of active disease or more likely because of some sort of reaction to the initial Lyme disease infection.
 {¶ 73} In his September 3, 2002 report, following his reexamination of relator, Dr. Kusumi again expressed uncertainty as to the cause of relator's medical condition which he again certified to be disabling:
 * * * [T]here is controversy about chronic Lyme disease. She does have some lab reports that would indicate she has a borderline positive IgM Western blot antibody test from June of 2001. The significance of this is really not clear in the context of clinical findings. There are individuals who are experts in this field, who feel that chronic Lyme disease manifestations are more of an immunologic process rather than an issue of active spirochete infection in multiplication. It appears to me that she has had several courses of antibiotics that should adequately eradicate any infection *Page 29 
that she has, absent any new exposure, which she apparently has not had.
 I feel uncomfortable diagnosing her with chronic disease based on an antibody test result, especially in light of her heavy antibiotic treatment history. * * *
 {¶ 74} In his May 13, 2004 report, following his third examination, Dr. Kusumi continues to express his uncertainty as to the medical cause of relator's medical condition:
 Once again, I have conflicting emotions about whether she is disabled from an infectious disease viewpoint. She may have had Lyme disease. What she has now is not clear. As I mentioned in my previous correspondence, there is currently some question in the literature as to whether patients similar to Ms. Yocum have ongoing active infection, which seems unlikely in the face of the multitude of antibiotic treatments, or whether she may have some sort of post-infectious inflammatory process. It may be that she has neither and simply suffers from either fibromyalgia or depression.
 {¶ 75} The magistrate notes, as relator here points out, that Dr. Season, in his February 28, 2001 letter to SERB, did state that MAC "recommends that disability retirement be approved on the basis Lyme's disease with reexamination in one year."
 {¶ 76} Based on a review of Dr. Kusumi's reports and notwithstanding Dr. Season's February 28, 2001 letter, it is clearly inaccurate to suggest that SERB's grant of the disability benefit or continuation of such benefit was premised upon a finding that relator was disabled by Lyme disease. While the record undisputedly indicates that relator had Lyme disease, Dr. Kusumi was uncertain that the Lyme disease was causing disability in 2001 when he first examined relator. In fact, in his first report dated February 6, 2001, Dr. Kusumi questioned whether disability was the result of "fibromyalgia or possibly related Lyme disease." *Page 30 
 {¶ 77} Moreover, there is no requirement under the statues or rules pertaining to SERS that respondent must positively identify or describe with certainty the disabling condition for which a disability benefit is granted. Clearly, SERB has the discretion to grant a disability benefit, as it did here, notwithstanding the medical uncertainty of its medical examiner as to the medical cause of a disabling condition. Here, relator was in fact the recipient of a disability benefit that was granted in spite of the uncertainty of the relied upon medical examiner as to the cause of disability.
 {¶ 78} Relator incorrectly asserts that Dr. Wolfe did not examine relator for Lyme disease. While a SERS form indicates that Dr. Wolfe was asked to examine relator for "fibromyalgia, chronic fatigue," Dr. Wolfe's November 1, 2004 report clearly indicates that she examined relator for Lyme disease and for any conditions that might be related to Lyme disease.
 {¶ 79} In her November 1, 2004 report, Dr. Wolfe acknowledged that, by history, relator had Lyme disease. She states: "but even if her Lyme Disease was chronic, she has none of the neurologic stigmata of Lyme Disease." Dr. Wolfe's medical impression is that relator has fibromyalgia, but she concedes that the fibromyalgia "could be secondary to her Lyme Disease."
 {¶ 80} Clearly, under the circumstances here, that Dr. Wolfe did not find evidence of active Lyme disease does not render her report nonprobative as to the issue of relator's continued eligibility for disability retirement.
 {¶ 81} Moreover, no physician of record has stated that Dr. Wolfe is unqualified to examine for active symptoms of Lyme disease or that she is incompetent to evaluate for Lyme disease. *Page 31 
 {¶ 82} Relator seems to suggest that, because Dr. Kusumi recommended that SERS search for a so-called "Lyme disease expert," that SERS was duty-bound to find such an expert and to have relator examined by such expert as a prerequisite to consideration of any termination of the disability benefit. Relator also seems to suggest that, because Dr. Joseph claimed to have special expertise in the treatment of Lyme disease, that SERS was duty-bound to have relator examined by a physician also claiming such specialized expertise. The magistrate disagrees with relator's suggested propositions.
 {¶ 83} While there is no evidence in the record that Dr. Wolfe has special expertise in the diagnosis and treatment of Lyme disease, she is clearly competent and qualified as a licensed physician to evaluate for Lyme disease.
 {¶ 84} Ohio Adm. Code 3309-1-40(B) grants to the MAC chairman the discretion to assign or appoint competent and disinterested physicians to conduct medical examinations of disability applicants and recipients. There has been no showing in this case that respondent, through its MAC chairman (Dr. Season), committed an abuse of discretion by appointing Dr. Wolfe to examine relator. Again, that Dr. Kusumi recommended obtaining an out-of-state expert on Lyme disease does not limit respondent's discretion.
 {¶ 85} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
/s/Kenneth W. Macke
 KENNETH W. MACKE, MAGISTRATE *Page 1